*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MAT-SU VALLEY MEDICAL CENTER, LLC, d/b/a MAT-SU REGIONAL MEDICAL CENTER, | Supreme Court Nos. S-15920/15969 (Consolidated) |
| Petitioner, | Superior Court No. 3PA-11-00963 CI |
| v. | O P I N I O N |
| DENISE BOLINDER, as personal representative of the estate of ROBERT BOLINDER, and JOHN W. ZWIACHER, M.D., | No. 7293 – September 14, 2018 |
| Respondents. | |
| MAT-SU VALLEY MEDICAL CENTER, LLC, d/b/a MAT-SU REGIONAL MEDICAL CENTER, and JOHN W. ZWIACHER, M.D., | Supreme Court No. S-16440 |
| | Superior Court No. 3AN-14-09235 CI |
| Petitioners, | |
| v. | |
| JON PAUL BRANDT, | |
| Respondent. | |

Original Applications in File Nos. S-15920/15969 from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge. Petition for Review in File

No. S-16440 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances:  Robert J. Dickson, Atkinson, Conway & Gagnon, and Roger F. Holmes, Biss & Holmes, Anchorage, for Petitioner Mat-Su Regional Medical Center.  Christian N. Bataille, Flanigan & Bataille, Anchorage, for Respondents Bolinder and Brandt.  Scott Leuning, Leuning & Renner, LLC, Sioux Falls, South Dakota, and Whitney L. Traeger and Howard A. Lazar, Delaney Wiles, Inc., Anchorage, for Respondent and Petitioner Dr. Zwiacher.  Stephen D. Rose, Garvey Schubert Barer, Anchorage, for Amicus Curiae Alaska State Hospital and Nursing Home Association.  Chester D. Gilmore, Cashion Gilmore LLC, Anchorage, for Amicus Curiae Providence Health & Services – Washington d/b/a Providence Alaska Medical Center.  Margaret Simonian, Dillon & Findley, P.C., Anchorage, and William S. Cummings, Friedman Rubin, Bremerton, Washington, for Amicus Curiae Alaska Association for Justice.

Before:  Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

# I.    INTRODUCTION

Alaska's medical peer review privilege statute, AS 18.23.030, protects discovery of data, information, proceedings, and records of medical peer review organizations, but it does not protect a witness's personal knowledge and observations or materials originating outside the medical peer review process.  A hospital invoked the privilege in two separate actions, one involving a wrongful death suit against a physician at the hospital and the other involving both a medical malpractice claim against the same physician and a negligent credentialing claim against the hospital.  In each case the

superior court compelled the hospital to disclose materials related to complaints submitted about the physician and to the hospital's decision to grant the physician medical staff membership. The hospital and the doctor sought our review of the discovery orders. Because we conclude that these discovery orders compel the hospital to disclose information protected by the peer review privilege, we reverse the discovery orders in part. We further hold that the false information exception to the privilege provided in AS 18.23.030(b) applies to actions for which the submission of false information is an element of the claim and thus does not apply here.

## II.    FACTS AND PROCEEDINGS

We address these two interlocutory appeals in this consolidated opinion due to the similarity of the facts, legal issues, and parties. In the first case, Denise Bolinder, in her capacity as the personal representative of the estate of Robert Bolinder, filed a claim for wrongful death against Dr. John Zwiacher, alleging that Dr. Zwiacher was negligent in treating Robert Bolinder when he was a patient at Mat-Su Regional Medical Center (Mat-Su) in 2009. In the second, Jon Brandt brought a claim for medical malpractice against Dr. Zwiacher and a negligent credentialing claim against Mat-Su after Brandt allegedly suffered complications from a September 2012 surgery Dr. Zwiacher performed at Mat-Su. In each case, Mat-Su refused to respond to discovery requests for materials related to (1) Mat-Su's decisions to renew Dr. Zwiacher's medical staff membership at Mat-Su; and (2) complaints that Mat-Su had received regarding Dr. Zwiacher. Mat-Su asserted that, because all the requested materials were acquired or generated by Mat-Su's peer review committees, they were privileged under the medical peer review statute and not subject to disclosure.

## A. The Medical Peer Review Privilege Statute And Mat-Su's Peer Review Committees

Some background on medical peer review generally, and the peer review committees at Mat-Su specifically, is necessary. Medical peer review "refers to the process hospitals use to oversee medical staff to improve patient care, reduce hospital liability, and lower rates for malpractice insurance."[1] Generally, the purpose of affording an evidentiary privilege to peer review materials is to promote candor in peer review proceedings, with the aim of more rigorous oversight of medical care and lower malpractice premiums.[2] Nearly all hospitals employ peer review procedures.[3] And almost all 50 states have adopted laws promoting the effectiveness of peer review by: (1) providing immunity from liability for persons serving on or providing information in good faith to peer review committees, and (2) creating an evidentiary privilege for certain materials related to the peer review process.[4]

Alaska's medical peer review privilege statute, AS 18.23.030, was enacted in 1976 as part of a broad, comprehensive bill intended to address the lack of malpractice insurance available to Alaska doctors.[5] The statute restricts discovery of information and

---

[1] *Grandstaff v. State*, 171 P.3d 1176, 1193 (Alaska App. 2007).

[2] *Id.*

[3] Charles David Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C. L. REV. 179, 179 (1988).

[4] *Id.* at 179-180; *see also* Eric Scott Bell, Comment, *Make Way: Why Arkansas and the States Should Narrow Health Care Peer Review Privileges for the Patient Safety and Quality Improvement Act of 2005*, 62 ARK. L. REV. 745, 751-52 (2009).

[5] STATE OF ALASKA, REPORT OF THE GOVERNOR'S MEDICAL MALPRACTICE INSURANCE COMMISSION 52-53 (Oct. 1, 1975),
(continued...)

data acquired by medical peer review organizations, along with the proceedings and records of those organizations. The privilege is subject to certain exceptions, including materials "otherwise available from original sources" or information within an individual's personal knowledge, and materials provided to a peer review organization that are alleged to contain knowingly false information. Disclosing privileged information is a misdemeanor.[6]

Mat-Su has two committees that it argues are protected by the peer review privilege. The first committee is the Medical Staff Peer Review Committee (Peer Review Committee), which is charged with reviewing all care provided by Mat-Su physicians and maintaining quality patient care within Mat-Su. The Peer Review Committee conducts professional practice evaluations of physicians, as is required for hospital accreditation. It consists of various Mat-Su personnel: the chairs of each clinical section, physicians from various specialities, a nursing representative, and an administrative representative. The second committee is the Medical Executive Committee (Executive Committee), which reviews reports and recommendations from the Peer Review Committee regarding any corrective action. The Executive Committee consists of physician representatives from each specialty group at Mat-Su. The Executive Committee makes decisions regarding both initial credentialing of health care providers and renewal of credentials, with the Board of Trustees making the final decision on any matter involving privileges or the loss thereof.

---

[5]     (...continued)
http://archives2.legis.state.ak.us/PublicImageServer.cgi?lib/7500360REPORT%20OF %20THE%20GOVERNOR%27S%20MEDICAL%20MALPRACTICE%20INSURA NCE%20COMMISSION.pdf [hereinafter MALPRACTICE COMMISSION REPORT].

[6]     AS 18.23.040.

**B.     First Petition In *Bolinder v. Zwiacher***

In January 2009 Dr. Zwiacher performed a diagnostic surgery on Robert Bolinder to examine an unidentified mass in his lungs and collect tissue samples. Three days after the surgery, Robert began experiencing pain in his left leg, and his wife, Denise, called Dr. Zwiacher. Dr. Zwiacher asked to speak with Robert, but there is a dispute regarding what Dr. Zwiacher then said. According to Dr. Zwiacher, he told Robert to go to the emergency room. But Denise claims that Robert told her that Dr. Zwiacher said a pinched nerve likely was causing his pain and advised Robert to rest at home. Later that same day, Robert died at home. An autopsy showed that his death was caused by multiple pulmonary emboli — blood clots lodging in and blocking arteries in the lungs — that likely came from the leg in which he was experiencing pain.

In 2011 Denise, as the personal representative of Robert's estate (the Estate), filed a wrongful death claim against Dr. Zwiacher alleging that he negligently treated Robert. The Estate conducted discovery to elicit information about Dr. Zwiacher's background preceding his position at Mat-Su, when he practiced medicine in Wisconsin. This information apparently suggested that Dr. Zwiacher misrepresented his work and disciplinary history on his 2005 application for an Alaska medical license and his 2006 application for medical staff membership at Mat-Su. To confirm this indication, the Estate moved to compel Dr. Zwiacher to consent to Mat-Su (a non-party) releasing his application for medical staff membership.[7] After the superior court denied the motion in April 2012, the Estate petitioned this court for interlocutory review.

---

[7]     In addition to medical staff membership, Dr. Zwiacher also applied for (and was granted) clinical privileges. To avoid confusion between his clinical privileges and the evidentiary privilege at issue here, we refer to Dr. Zwiacher's application as being only for medical staff membership.

In 2013 we granted the petition and reversed the denial of the motion to compel.[8] We held for the purposes of "this case" that one of the exceptions to the peer review privilege, excluding certain material alleged to contain false information,[9] applied. We concluded that the application was not privileged because the Estate had submitted evidence showing Dr. Zwiacher had lied on his application for an Alaska medical license, which suggested he also provided this false information in applying to Mat-Su.[10] However, "we d[id] not decide" how this exception to the privilege "should be interpreted or how it may apply in future cases" given the parties' cursory briefing and lack of argument on the scope of the exception.[11] We thus ordered Mat-Su to provide Dr. Zwiacher's application to the Estate.

## C.     The Estate's Discovery Requests To Mat-Su

Following our order, Mat-Su provided the Estate with Dr. Zwiacher's initial application for medical staff membership. Mat-Su also produced documents revealing that Dr. Zwiacher's medical staff membership at Mat-Su had been revoked in April 2014 and detailing the disciplinary steps that preceded the revocation. The Estate amended its complaint to allege that Dr. Zwiacher obtained the privileges necessary to treat Robert by lying about his work history on his application to Mat-Su.

The Estate then made several discovery requests of Mat-Su. First the Estate requested "[a]ll documents related in any way to the evaluation and granting of [Dr. Zwiacher's] [medical staff membership] at Mat-Su Regional" and asked to depose

---

[8]     *Bolinder v. Zwiacher*, No. S-14710 (Alaska Supreme Court Order, Dec. 4, 2013) [hereinafter *Bolinder* Order].

[9]     AS 18.23.030(b).

[10]     *Bolinder* Order, *supra* note 8.

[11]     *Id.*

people knowledgeable about Mat-Su's decision to grant him membership. Mat-Su objected, citing the peer review privilege. The Estate also sought to depose Mat-Su personnel with knowledge of the identity of individuals "likely to possess personal knowledge regarding [Dr. Zwiacher's] professional credibility, behavior, and/or conduct" including knowledge of any limitation or revocation of Dr. Zwiacher's medical staff membership imposed by Mat-Su. Mat-Su again objected on the basis of the peer review privilege to the extent the request asked for more than the designation of individuals with personal knowledge of Dr. Zwiacher's credibility. Mat-Su then designated Joan Brodie, the assistant director of quality risk management and provider services, to testify on these topics. Brodie's job duties include overseeing the credentialing process, addressing regulatory compliance issues, and participating in the peer review process.

At the deposition Brodie provided the names of several general surgeons, anesthesiologists, and hospitalists who might have information about Dr. Zwiacher's credibility. She also advised the Estate to contact the heads of the nursing and operating room staffs to obtain information about others who had worked with him. But, citing the peer review privilege, Mat-Su objected to many of the Estate's inquiries, including those asking whether any complaints had been raised about Dr. Zwiacher and the nature of Brodie's interactions with him. Brodie explained that "every contact [she] had with [Dr. Zwiacher] was within . . . the course of what [she] do[es]"; therefore she could not answer such questions because the information was privileged.

The Estate additionally sought to depose Drs. John Naylor and Bruce Hess. Dr. Hess served as the president of the medical staff before Dr. Naylor assumed the position. Dr. Naylor served as the president of the medical staff, chaired the Executive Committee, and worked at Mat-Su as an anesthesiologist. In early January 2015, when the deposition was taken, Dr. Naylor had served as president of the medical staff for

about nine months. Though the Estate did ultimately depose Dr. Naylor, it did not depose Dr. Hess.

Dr. Naylor testified that, as president of the medical staff, he serves as the chair of the Executive Committee. He had also previously served as the chair of the Peer Review Committee. Dr. Naylor explained that the peer review process is initiated by concerns and complaints from Mat-Su staff. Dr. Naylor confirmed that outside the peer review process "nothing ever happened with [him] and Dr. Zwiacher that in any way gave [him] concern or raised an issue regarding [Dr. Zwiacher's] patient care with [him] personally." And because his familiarity with Dr. Zwiacher's competency and surgical care derived from the peer review process, he could not answer questions about these topics. Mat-Su objected to questions asking Dr. Naylor to identify people with information related to concerns or complaints about Dr. Zwiacher and asking for "original sources . . . [with] information regarding Dr. Zwiacher's behavior and conduct . . . at the hospital." Dr. Naylor contended he could not divulge such information because he had acquired it through his role in the peer review process. He explained that "[a]ny complaint or issue . . . that enters the peer review or quality review system . . . falls under the [privilege's] protection" and that this applied to all complaints about Dr. Zwiacher.

Following its unsuccessful attempts to elicit information at the depositions, the Estate filed two motions to compel disclosure from Mat-Su related to: (1) its decision to grant Dr. Zwiacher medical staff membership and (2) complaints related to Dr. Zwiacher's competency and credibility, including the identity of people possessing personal knowledge of such information.

The superior court granted both motions in two separate discovery orders. The first discovery order, issued on April 27, 2015, granted the Estate's request to discover materials related to the decision to grant Dr. Zwiacher's application for medical

staff membership. The superior court concluded that Mat-Su must disclose such materials because the Estate alleged that Dr. Zwiacher knowingly included false information in his application, and thus the materials fell within an exception to the peer review privilege. The first order further permitted the Estate to obtain *all* materials provided to a peer review committee that were alleged to contain knowingly false information, specifically:

> testimony, documents, proceedings, records, and other evidence adduced before a review organization that are otherwise inaccessible under [the peer review privilege] if [the Estate] claims that information provided to a review organization was false and claims that the person providing the information knew or had reason to know the information was false.

The second discovery order, issued on June 10, 2015, granted the Estate's request to obtain complaints that Mat-Su had received about Dr. Zwiacher. The superior court concluded that such complaints did not fall within the peer review privilege; though they may initiate the peer review process and later become evidence in a peer review proceeding, they are not part of such a proceeding. Thus, subject to requests for in camera review, the court instructed employees and members of the medical staff at Mat-Su with "personal knowledge" of such complaints to provide this information to the Estate "without regard to whether [they] presented such information to a peer review committee." It also instructed Mat-Su and Dr. Zwiacher to "produce all documents or records . . . regarding complaints or concerns regarding Dr. Zwiacher's conduct that were not generated by or did not originate with a peer review committee."

Mat-Su filed an original application for review of these two discovery orders, which we granted. Dr. Zwiacher and three amici curiae — Alaska Association for Justice, Alaska State Hospital and Nursing Home Association, and Providence

Alaska Medical Center — also filed briefs.[12]  While the appeal was pending, the petition for interlocutory review in *Brandt* was filed.

### D.    Petition In *Brandt v. Zwiacher*

Jon Brandt was also a patient of Dr. Zwiacher.  Dr. Zwiacher performed a laparoscopic small bowel resection surgery on Brandt at Mat-Su in September 2012 (when Dr. Zwiacher still had medical staff membership).  During recovery, Brandt complained of pain; the parties dispute how Dr. Zwiacher addressed Brandt's pain. Brandt was discharged from Mat-Su four days after surgery, which Brandt alleges was involuntary.  Brandt claims that upon discharge, his pain worsened; he returned to Mat-Su approximately eight hours later.  A CT scan was performed, which Brandt claims revealed that Dr. Zwiacher had perforated the left side of his colon during the surgery, resulting in leaking and an infection.  According to Brandt, he has undergone seven additional surgeries to address the issues stemming from the surgery performed by Dr. Zwiacher.

In September 2014, while discovery in *Bolinder* was still ongoing, Brandt filed suit against Dr. Zwiacher and Mat-Su.  Brandt brought a medical malpractice claim against Dr. Zwiacher, alleging that Dr. Zwiacher misrepresented his skills prior to the surgery, delivered substandard medical care, created false and misleading records of Brandt's medical care following the surgery, and obtained both his medical license and his Mat-Su medical staff membership through misrepresentation and non-disclosure. Brandt also brought a negligent credentialing claim against Mat-Su based on the

---

[12]    Alaska Association for Justice argues that we should affirm the discovery orders; Alaska State Hospital and Nursing Home Association and Providence Alaska Medical Center argue that we should reverse.

hospital's decision to grant and renew Dr. Zwiacher's staff membership.[13] Brandt claimed that, given Dr. Zwiacher's professional troubles in Wisconsin and the litany of complaints regarding his conduct and standard of care while at Mat-Su, Mat-Su failed to act with reasonable diligence in vetting Dr. Zwiacher's initial application for medical staff membership and in subsequently renewing it.

Discovery ensued, during which Mat-Su voluntarily disclosed, subject to a protective order, Dr. Zwiacher's entire 443-page credentials file, which contains all of the materials Mat-Su's credentials committee used in granting Dr. Zwiacher's initial appointment to the Mat-Su medical staff and all subsequent renewals. The file includes Dr. Zwiacher's initial application for medical staff membership at Mat-Su (the same application that had led to the first petition for review in *Bolinder*).[14] The credentials file also contains confidential communications regarding Dr. Zwiacher to the Executive Committee written while his initial application was pending.

---

[13]    A negligent credentialing claim derives from the theory of corporate negligence, under which "a hospital owes an independent duty to its patients to use reasonable care to insure that physicians granted hospital privileges are competent, and to supervise the medical treatment provided by members of its medical staff." *Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833, 842 (Alaska 2003) (quoting *Jackson v. Power*, 743 P.2d 1376, 1378 n.2 (Alaska 1987)). "A corporate negligence claim requires proof that the hospital should have known that the physician would act negligently before the negligence at issue occurred." *Ward v. Lutheran Hosps. & Homes Soc'y of Am., Inc.*, 963 P.2d 1031, 1033 n.2 (Alaska 1998). Such proof generally consists of "evidence that the physician either lacked standard credentials or previously had been the subject of a malpractice suit or disciplinary proceedings." *Id.*

[14]    Mat-Su explains on appeal that it is not conceding that the initial credentials file is not privileged, but given this court's prior order in *Bolinder* compelling disclosure of Dr. Zwiacher's initial application and "the uncertainty surrounding the extent of the protection afforded [to the file] by [the peer review privilege]," Mat-Su "felt compelled in good faith to produce the entire credentials file."

However, the credentials file does not contain any concerns or complaints relayed to Mat-Su regarding Dr. Zwiacher *after* he was granted medical staff membership or regarding Mat-Su's decision to terminate Dr. Zwiacher's membership. Mat-Su explained that such materials were not part of the credentials file because the Mat-Su Medical Staff Bylaws delegated the decision to discipline or to terminate Dr. Zwiacher to the Peer Review Committee and the Executive Committee, not the credentials committee. Accordingly, "[a]ll of the documents generated after Dr. Zwiacher's appointment to the medical staff relating to complaints and concerns about him . . . are outside the credentialing process and [are instead] reported to the . . . [Peer Review Committee and Executive Committee]."

After receiving the credentials file, Brandt sent six discovery requests to Mat-Su that form the basis of his appeal. Like the requests in *Bolinder*, Brandt's requests can be divided into two broad groups: (1) documents related to any complaints made about Dr. Zwiacher, the identity of individuals making and reviewing the complaints, and any action taken in response; and (2) documents and statements related to Mat-Su's decisions to renew or terminate Dr. Zwiacher's medical staff membership and the identity of individuals involved in those decisions.

Mat-Su objected to these discovery requests, asserting that each request sought information covered by the peer review privilege.[15] In March 2016 Brandt moved

---

[15]     Brandt quibbles with Mat-Su's purported failure to produce a privilege log in refusing to respond to the discovery requests. However, Brandt represents that Mat-Su ultimately did produce a privilege log that identified more than 1900 pages of privileged materials. This privilege log is not part of the appellate record because it was produced after the petition for review was granted. Brandt does not appear to take issue with the adequacy of the privilege log that was ultimately produced; accordingly, we do not address this issue.

to compel Mat-Su's responses to the discovery requests.[16] In its opposition, with respect to the first group of requested information, Mat-Su argued that the identities both of individuals reporting complaints about Dr. Zwiacher and of individuals considering the complaints were privileged. It explained that such complaints initiated the peer review process and were directed to peer review committee members, and they were thus part of the committee proceedings. Regarding the second group of requested information, Mat-Su conceded that it had not produced "the files and meeting minutes of the [Peer Review Committee] and the [Executive Committee], the purpose of which was to review the quality of care provided by Dr. Zwiacher at the hospital subsequent to his obtaining privileges," but argued these materials were privileged. Mat-Su explained that, other than the credentials file and this privileged material, it possessed "no other documented communication relating to Dr. Zwiacher's renewal or termination."

In August 2016 the superior court granted Brandt's motion to compel and ordered production of all the information sought in the six production requests. The court reasoned that the names of the individuals making complaints about Dr. Zwiacher and the content of those complaints were not privileged because they were based on the personal knowledge of individuals not acting in the capacity of peer review committee members. The superior court thus concluded that Mat-Su had failed to meet its burden of establishing that the discovery requests fell within the scope of the privilege and accordingly ordered Mat-Su to produce the requested materials. The superior court's analysis appears to have considered only one group of discovery requests (relating to

---

[16] In his motion to compel, Brandt argued that by voluntarily producing the credentialing file, Mat-Su had waived the protection of the peer review privilege as applied to any of its files. However, Brandt does not renew this argument on appeal (despite Mat-Su mentioning this argument in its brief); thus we deem it forfeited and do not address it.

complaints) and not the other (relating to Mat-Su's credentialing decisions). However, it ultimately compelled disclosure of all requested information. Mat-Su and Dr. Zwiacher jointly petitioned for interlocutory review of the superior court's order, and we granted the petition.

## III. STANDARD OF REVIEW

We generally review discovery rulings for abuse of discretion, "but whether a privilege applies is a question of law we review independently."[17] Here, the scope of the privilege is codified in a statute.[18] When interpreting statutes, we apply our independent judgment,[19] adopting the "rule of law that is most persuasive in light of precedent, reason, and policy."[20]

## IV. DISCUSSION

### A. Alaska Statute 18.23.030 Provides Robust Protections For The Medical Peer Review Process.

This case requires us to interpret the scope of the medical peer review privilege in the context of a wrongful death action and a medical malpractice claim against a surgeon, and a negligent credentialing claim against the surgeon's hospital. The privilege, codified in AS 18.23.030, contains two subsections relevant to this case. The first, subsection (a), sets out the scope of the privilege and provides a specific

---

[17] *Peterson v. State*, 280 P.3d 559, 561 (Alaska 2012).

[18] *See* AS 18.23.030.

[19] In their *Bolinder* briefs, Mat-Su and Dr. Zwiacher contend that the scope of the peer review privilege also presents a question of fact: when the medical peer review process begins at Mat-Su. This framing impermissibly invades the legislative province by allowing a hospital to define AS 18.23.030's scope. The issue here — the scope of the peer review privilege — presents only a question of law.

[20] *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016) (quoting *Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1167 (Alaska 2009)).

limitation on it. The second, subsection (b), outlines two exceptions where the privilege does not apply. Aside from our 2013 limited order, we have never considered the scope of either subsection.[21]

This case thus requires interpretation of the peer review statute. "Interpretation of a statute begins with its text."[22] In addition to the text, we also consider a statute's legislative history and purpose.[23] In construing a statute, we have adopted a sliding scale approach whereby "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[24] Whenever possible "we interpret each part or section of a statute with every other part or section, so as to create a harmonious whole."[25] Finally, because Alaska's "civil rules

---

[21]     The court of appeals considered whether AS 18.23.030 applied in criminal cases in *Grandstaff v. State*, 171 P.3d 1176, 1190-97 (Alaska App. 2007). The court of appeals concluded that the privilege applied only in civil cases based on the statute's plain language and legislative history. *Id.* at 1194. This appeal does not directly implicate the decision in *Grandstaff*.

[22]     *City of Kenai v. Friends of The Recreation Ctr., Inc.*, 129 P.3d 452, 458-59 (Alaska 2006).

[23]     *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 595 (Alaska 2012).

[24]     *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 594, 597 (Alaska 2011) (quoting *Gov't Emps. Ins. Co. v. Graham-Gonzalez*, 107 P.3d 279, 284 (Alaska 2005)).

[25]     *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013) (quoting *State, Dep't of Commerce, Cmty., & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007)).

favor a system of liberal pretrial discovery,"[26] we generally construe an evidentiary privilege narrowly.[27]

Subsection (a) outlines the scope of the peer review privilege in three sentences. The first sentence protects from discovery "all data and information acquired by a review organization in the exercise of its duties and functions."[28] This sentence appears to include a review organization's investigative process. Such information might include statements made by a doctor under investigation, statements made by other medical staff during an investigation,[29] and information acquired to assess a physician's fitness to practice.[30] The second sentence applies to a different step of the review process; it protects what transpired at a meeting of a review organization:

---

[26] *Noffke v. Perez*, 178 P.3d 1141, 1150 (Alaska 2008) (quoting *Jones v. Jennings*, 788 P.2d 732, 735 (Alaska 1990)).

[27] *Langdon v. Champion*, 752 P.2d 999, 1004 (Alaska 1988) ("Given our commitment to liberal pre-trial discovery, . . . the scope of the attorney-client privilege should be strictly construed . . . ." (quoting *United Servs. Auto. Ass'n v. Werley*, 526 P.2d 28, 31 (Alaska 1974))); *Am. Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1333-34 (Alaska 1982) (same); *see also United States v. Nixon*, 418 U.S. 683, 713 (1974) ("The generalized assertion of a privilege must yield to the demonstrated, specific need for evidence in a pending . . . trial.")*; Gwich'in Steering Comm. v. State, Office of the Governor*, 10 P.3d 572, 578-79 (Alaska 2000) (noting that this court "narrowly construe[s]" the deliberate process privilege, an exception to the Public Records Act); *Russell v. Municipality of Anchorage*, 706 P.2d 687, 693 (Alaska App. 1985) ("Privileges in litigation are not favored and should be narrowly construed.").

[28] AS 18.23.030(a).

[29] *See Grandstaff v. State*, 171 P.3d 1176, 1193 (Alaska App. 2007).

[30] *Cf. John C. Lincoln Hosp. & Health Ctr. v. Superior Court*, 768 P.2d 188, 190 (Ariz. App. 1989) (concluding application for staff privileges and "investigations into [physician's] background, work, and experience before his association" with hospital were privileged under Arizona peer review statute).

[A] [member of a review organization] may not disclose what transpired at a meeting of a review organization except to the extent necessary to carry out the purposes of a review organization, and the proceedings and records of a review organization are not subject to discovery or introduction into evidence in a civil action against a health care provider arising out of the matter that is the subject of consideration by the review organization.[31]

The final sentence of AS 18.23.030(a) limits the scope of the privilege defined in the first two sentences; the privilege does not extend to "original sources" or to "matters within [a] person's knowledge" even if the person served on a review organization or testified during a proceeding:

*Information, documents, or records otherwise available* from original sources *are not immune from discovery* or use in a civil action *merely because they were presented during proceedings of a review organization*, nor may a person who testified before a review organization or who is a member of it be prevented from testifying as to *matters within the person's knowledge*, but a witness may not be asked about the witness's testimony before a review organization or opinions formed by the witness as a result of its hearings, except as provided in (b) of this section.[32]

Subsection (a) thus sets out three conditions that a piece of evidence must satisfy for the privilege to apply. First, the peer review committee from which the evidence is sought must be a "review organization." The parties in both cases appear to concede that the Peer Review Committee and the Executive Committee both fall within

---

[31]    AS 18.23.030(a).

[32]    *Id.* (emphases added).

-18-                                                    **7293**

the statutory definition of "review organization."[33] Dr. Naylor's deposition testimony regarding the Executive Committee's role supports this concession, as do the descriptions of the roles of the Peer Review Committee and Executive Committee in the Mat-Su Medical Staff Bylaws. Second, the evidence must fall into at least one of the two protected categories of information: (1) "data and information acquired by a review organization in the exercise of its duties and functions," or (2) "what transpired at a meeting of a review organization [and] . . . the proceedings and records of a review organization" *if* this category of information is sought "in a civil action against a healthcare provider arising out of the matter that is subject of consideration by the review organization."[34] Third, the evidence must not be "otherwise available from original sources" or within an individual's personal knowledge.

---

[33]     Alaska Statute 18.23.070(5)(A) defines "review organization," in relevant part, as "a hospital governing body or a committee whose membership is limited to health care providers and administrative staff . . . and that is established by a hospital . . . to gather and review information relating to the care and treatment of patients" for certain enumerated purposes, such as improving the quality of healthcare provided, reducing mortality, resolving disputes between patients and insurers, or acting on the recommendation of a credential review committee.

[34]     The protection for the first category of information is unqualified; it applies in all cases. In contrast, the second category of information is protected only in certain cases: "civil actions against health care providers arising out of the matter that is the subject of consideration by the review organization." AS 18.23.030(a). Brandt's and the Estate's suits certainly qualify as a civil action against a healthcare provider; but it is not clear that either action "aris[es] out of" the matter that the review organization considered. The parties did not address this issue in their briefing, and we do not address it here because we conclude that all the material addressed in the discovery orders is protected under the first category. To the extent the superior court on remand considers whether material is protected under the second category of information, it must address whether the action arises out of the matter under consideration by the review organization.

We first consider whether the privilege established in subsection (a) protects any of the materials compelled disclosed by the discovery orders at issue. We then consider whether either exception to the privilege outlined in subsection (b) applies.

**B. Materials Related To Complaints About A Physician Held In The Files Of A Review Organization Are Privileged Under AS 18.23.030(a) Even If Those Materials Originate From Outside Sources.**

Both the Estate and Brandt seek information that Mat-Su possesses regarding complaints about Dr. Zwiacher, including the identities of individuals with personal knowledge of such complaints. The superior court in each case compelled Mat-Su to disclose this information. In *Bolinder* the superior court instructed Mat-Su employees and medical staff members with "personal knowledge" of such complaints to provide this information to the Estate "without regard to whether [they] presented such information to a peer review committee." It also ordered Mat-Su and Dr. Zwiacher to "produce all documents or records sought by the [Estate] regarding complaints or concerns regarding Dr. Zwiacher's conduct that were not generated by or did not originate with a peer review committee." In doing so the court effectively required Dr. Naylor to disclose complaints about Dr. Zwiacher that he had received from others in his capacity as the Executive Committee president, which counsel for the Estate had tried to elicit unsuccessfully during Dr. Naylor's deposition. Similarly in *Brandt*, the superior court ordered Mat-Su to produce materials relating to complaints regarding Dr. Zwiacher's competency and credibility, the identity of the individuals making and reviewing the complaints, and any action taken in response. In each case the superior court reasoned that materials regarding such complaints fell outside the privilege because, though they may initiate the peer review process and later become evidence in

a peer review proceeding, they are based on observations occurring in the normal course of rendering medical care and preceding the commencement of peer review.

Exercising our independent judgment, we conclude that the plain language of AS 18.23.030(a) supports a broader construction of the privilege that protects complaint-related materials contained in peer review committee files, even if those materials were not generated by the peer review committee but rather originated outside the peer review process. In reaching this conclusion we are mindful that an evidentiary privilege should be construed narrowly, but we conclude that the text of AS 18.23.030(a) does not support a narrower interpretation of the peer review privilege than that which we reach here.

Complaint-related materials contained in peer review committee files, the identities of the individuals reporting and reviewing the complaints, and any internal action taken in response satisfy the requirements for the privilege to apply. First, these materials are "acquired by a review organization in the exercise of its duties and functions."[35] Black's Law Dictionary defines "acquire" as "[t]o gain possession or control of; to get or obtain."[36] The use of this broad term implies that *all* information contained in peer review committee files is privileged, even if it was not generated by the committee but rather originated from an outside source. And Mat-Su has represented that all of the responsive materials in its possession were initially reported to either the Executive Committee or the Peer Review Committee. Accordingly, all of these materials were acquired by a peer review committee.

---

[35] Mat-Su also argues that the identities of individuals raising concerns or complaints are privileged because Mat-Su Medical Staff Bylaws guarantee such individuals confidentiality. However this guarantee of confidentiality cannot supplant the scope of the peer review privilege set out in the statute.

[36] *Acquire*, BLACK'S LAW DICTIONARY (10th ed. 2014).

-21-                                                                        7293

Moreover, this acquisition was "in the exercise of [the committees'] duties and functions." One statutorily defined duty and function of a review organization is "evaluating and improving the quality of health care rendered" in the hospital.[37] Mat-Su employees are instructed to report concerns or complaints about medical staff members to the Executive Committee when the information implicates patient safety or patient care, and the Executive Committee and the Peer Review Committee are both tasked with maintaining the quality of patient care within Mat-Su. Thus when such complaints are reported to and reviewed by the Peer Review Committee and Executive Committee, it is at least in part for the purpose of maintaining the quality of patient care.

Likewise, complaints and concerns directed to Dr. Naylor are also protected as information acquired by a review organization. Dr. Naylor is the president of the Executive Committee and testified in his deposition that such complaints are the initial step in the peer review process and initiate that process. Moreover, the Mat-Su Medical Staff Bylaws provide that "[a]ny person" can report to a medical staff member "information . . . about the conduct, performance, or competence" of a medical staff member, and indicate that such reports are the first step in the Executive Committee peer review process. The president of the Executive Committee then reviews the information and can elect to initiate "an investigation or action" against the medical staff member. Accordingly, complaints about Dr. Zwiacher that Dr. Naylor received from other Mat-Su employees and medical staff members are "information acquired by a review organization in the exercise of its duties and functions" because receipt of such information is the preliminary step in commencing the peer review process.[38]

---

[37]     *See* AS 18.23.070(5) (defining "review organization").

[38]     The record contains sufficient information about Dr. Naylor's role in relation to the peer review committees for us to reach this conclusion. However, there

(continued...)

Brandt and the Estate counter that Mat-Su must nevertheless provide the materials they seek because the privilege specifically excludes from protection "[i]nformation, documents, or records otherwise available from original sources" or matters within an individual's "person[al] knowledge," even if those materials were presented during or were the subject of testimony at review organization proceedings.[39] However, this argument views the limitation on the privilege in a vacuum, without regard for the broad privilege outlined in the plain text of the preceding two sentences.[40] The first sentence prohibits a review organization from revealing the information and data it acquires; the second sentence protects a review organization's deliberations. Reading the limitation in the third sentence in conjunction with the broad protection in these first

---

[38]    (...continued)
is a paucity of information in the record about the role that other members of the medical staff may play on the peer review committees and in the peer review process. Therefore, based on this record, we cannot determine whether the privilege extends to complaints directed to other members of the medical staff or the peer review committees. There is also not sufficient information regarding administrator Joan Brodie's role to allow us to determine whether complaints directed to her are privileged. But we note that to the extent Brodie has observed personally Dr. Zwiacher's conduct, these personal observations are not privileged, contrary to her assertions at her deposition. We leave it to the superior court to determine on remand whether other individuals may be required to divulge information relating to complaints about Dr. Zwiacher that were reported to them. In making these determinations the superior court must apply the analytical approach and must be guided by the policy considerations that we set forth in this opinion.

[39]    AS 18.23.030(a).

[40]    *See Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017) ("[W]hen construing a statute, 'we must, whenever possible, interpret each part . . . with every other part . . . , so as to create a harmonious whole.' " (quoting *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007))).

two sentences suggests that the limitation permits a litigant to obtain the original information or personal knowledge only from outside sources.  In other words, it limits the avenue of discovering this information to the original source or the individual with personal knowledge.  A contrary interpretation allowing a peer review committee or a committee member to be compelled to disclose such original source information would eviscerate the peer review privilege's protection for all data and information acquired by the committee and for the committee's deliberations.  It would also render meaningless the limitation's requirement that the materials be "otherwise available" from other sources.  Therefore, this limitation does not require the peer review committees or Dr. Naylor to divulge any materials related to concerns or complaints about Dr. Zwiacher, even if the materials were obtained from an original source outside the peer review process.

Other jurisdictions with peer review statutes like AS 18.23.030 have similarly construed the privilege so that materials may be obtained only from the original source.  For example, Minnesota's peer review statute contains a limitation allowing discovery of original source materials, which is worded nearly identically to Alaska's limitation.[41]  The Minnesota Court of Appeals rejected the argument that this limitation

---

[41]    The Minnesota limitation provides:

Information, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization, nor shall any person who testified before a review organization or who is a member of it be prevented from testifying as to matters within the person's knowledge, but a witness cannot be asked about the witness' testimony before a review organization or opinions formed by the witness as a result of its hearings.

(continued...)

required a review organization to divulge documents it had acquired from original sources.[42] Instead, the Minnesota court interpreted the limitation to allow discovery only from the original sources, not the peer review committee.[43] Similarly, the Minnesota Supreme Court — in concluding its peer review statute did not preclude a common law claim for negligent credentialing — suggested that the statute prevented a party from obtaining information directly from a review organization.[44] The court noted that Minnesota's peer review statute "preclude[d] the discovery of what evidence was actually obtained by the [peer review organization] in the credentialing process,"[45] indicating that the original source limitation does not require the organization to divulge such evidence, even if it was obtained from outside sources.

South Carolina's original source limitation is also worded very similarly to that of Alaska's peer review statute.[46] The South Carolina Supreme Court has likewise

---

[41]     (...continued)
Minn. Stat. § 145.64(1) (2017).

[42]     *In re Fairview-Univ. Med. Ctr.*, 590 N.W.2d 150, 154 (Minn. App. 1999).

[43]     *Id.* ("[D]ocuments available from other sources remain discoverable from other sources.").

[44]     *Larson v. Wasemiller*, 738 N.W.2d 300, 302, 310 (Minn. 2007).

[45]     *Id.* at 310.

[46]     South Carolina's limitation provides:

Information, documents, or records which are otherwise available from original sources are not immune from discovery or use in a civil action merely because they were presented during the committee proceedings, nor shall any complainant or witness before the committee be prevented from testifying in a civil action as to matters of which he has

(continued...)

rejected a litigant's attempt to access original source documents directly from the peer review committee.[47] The court reasoned that the original source limitation meant that information "available from a source other than the committee does not become privileged simply by being acquired by the review committee."[48] But a plaintiff seeking such information "cannot obtain [it] . . . directly from the [peer review] committee" and instead must obtain it "from alternative sources."[49]

These cases from jurisdictions with similar peer review statutes bolster our interpretation of the original source limitation in Alaska's peer review statute. We interpret this limitation to permit discovery of original source information only from the original source or the individual with personal knowledge. The limitation does not require a peer review committee or its members to disclose these materials. Accordingly it does not compel Mat-Su's peer review committees to disclose complaints reported to them relating to Dr. Zwiacher, the identities of the individuals reporting or reviewing those complaints, or any internal actions taken in response. We note however that the privilege does not extend to an individual's personal observations and knowledge

---

[46] (...continued)
knowledge apart from the committee proceedings or revealing such matters to third persons.

S.C. Code Ann. § 40-71-20(A) (2018).

[47] *McGee v. Bruce Hosp. Sys.*, 439 S.E.2d 257, 260 (S.C. 1993).

[48] *Id.*

[49] *Id.*; *see also Prince v. Beaufort Mem'l Hosp.*, 709 S.E.2d 122, 128 (S.C. App. 2011) ("To the extent the [peer review committee] obtained documents from other sources during the course of its investigation, [the plaintiff] may seek copies of those documents from the original sources but not from the [peer review committee] file.").

derived outside the peer review process even if the individual serves on a review organization or the information relates to a matter under review.

Having established the scope of the peer review privilege outlined in AS 18.23.030(a), we now reverse in part the superior court's June 2015 discovery order in *Bolinder*. We affirm the portion of the order requiring Mat-Su medical staff to answer questions based on their personal knowledge. However, the Estate may not ask questions about staff knowledge of review proceedings. We reverse the portion of the order compelling Mat-Su to provide peer review materials about complaints or concerns regarding Dr. Zwiacher's conduct. To the extent that responsive materials are contained in peer review committee files, the Estate may not obtain such information from Mat-Su even if the materials originated from outside knowledge or were generated based on personal knowledge.

We also reverse the superior court's order in *Brandt* compelling Mat-Su to respond to Brandt's request for production 2 and interrogatories 3 and 10. Each of these three discovery requests similarly seek privileged information regarding complaints about Dr. Zwiacher, the identity of individuals reporting and reviewing the complaints, documents relating to those complaints, and actions taken in response to the complaints. To the extent all responsive materials and information are contained in peer review committee files, this information is privileged. Brandt may nevertheless attempt to obtain this information from original sources outside the peer review process or from individuals with personal knowledge of Dr. Zwiacher's conduct.

**C.  The False Information Exception In AS 18.23.030(b) Does Not Permit Discovery Of Information Regarding Dr. Zwiacher's Application For Medical Staff Membership Because It Applies To Actions For Which The Submission Of False Information Is An Element.**

Alaska Statute 18.23.030(b) provides two exceptions to the peer review privilege outlined in subsection (a). In full, subsection (b) provides:

> Testimony, documents, proceedings, records, and other evidence adduced before a review organization that are otherwise inaccessible under this section may be obtained *by a health care provider who claims that denial is unreasonable* or may be obtained under subpoena or discovery proceedings brought *by a plaintiff who claims* that information provided to a review organization was false and claims that the person providing the information knew or had reason to know the information was false.[50]

The parties appear to agree that the first exception — which grants a "health care provider" access to materials otherwise privileged under subsection (a) when the provider "claims that denial is unreasonable"[51] — does not apply. But the parties disagree whether the second exception, the false information exception, applies. Under this exception, "a plaintiff who claims that information provided to a review organization was false and claims that the person providing the information knew or had reason to know the information was false" may obtain, by subpoena or discovery proceedings, evidence otherwise privileged under subsection (a).[52]

The Estate and Brandt argue that the false information exception applies to exclude from the privilege all materials related to the decision to grant, renew, suspend, or revoke Dr. Zwiacher's medical staff membership at Mat-Su and the identities of the individuals involved in the decisions.[53] They argue that the exception applies to these

---

[50]   AS 18.23.030(b) (emphases added).

[51]   *Id.* As relevant here a "health care provider" includes "a physician licensed under AS 08.64," "a hospital as defined in AS 47.23.900," and "an employee of a health care provider acting within the course and scope of employment." AS 18.23.070(3).

[52]   AS 18.23.030(b).

[53]   The Estate and Brandt also contend that a contrary construction of AS 18.23.030(b) would conflict with our previous 2013 order in *Bolinder*. But we

(continued...)

materials because the Estate and Brandt each allege that Dr. Zwiacher knowingly included false information in his initial application for medical staff membership.[54] But we conclude that this interpretation of the false information exception is too broad. The false information exception applies to plaintiffs bringing claims for which the submission of false information is an element. Since none of the claims at issue contain the submission of false information as an element, neither the Estate nor Brandt qualifies as a plaintiff within the meaning of the false information exception.

We base our interpretation of the false information exception on two aspects of the peer review statute. First, we must read the exceptions to the peer review privilege in subsection (b) *in pari materia* with other sections of the peer review statute. Under the *in pari materia* canon of statutory construction, we construe statutory provisions "enacted at the same time, or deal[ing] with the same subject matter" together.[55] The peer review privilege and its exceptions were enacted in 1976 as part of

---

[53]   (...continued)
limited that order to that interlocutory appeal and explicitly refrained from deciding how the exception "should be interpreted or how it may apply in future cases." *Bolinder Order*, *supra* note 8. And this opinion does not alter our limited 2013 order. That order required Mat-Su to release Dr. Zwiacher's application for hospital privileges to the Estate, but nothing more. *Id.* Mat-Su has complied with that order.

[54]   In addition, in its first petition for review, the Estate argued that a committee considering an initial credentialing decision is not a "review organization" within the meaning of this exception to the peer review statute because it does not serve one of the statutorily defined functions of such an organization. Neither the Estate nor Brandt renews this argument in this appeal. Because Mat-Su has already provided the initial credentialing file to both the Estate and Brandt, this argument is moot, and we do not consider whether such a committee qualifies as a review organization.

[55]   *Bullock v. State, Dep't of Cmty. & Reg'l Affairs*, 19 P.3d 1209, 1214-15 (Alaska 2001) (quoting *Underwater Constr., Inc. v. Shirley*, 884 P.2d 150, 155 (Alaska
(continued...)

a comprehensive medical malpractice insurance bill.[56] Another provision of the statute, AS 18.23.010, contains similar language to that of the false information exception in AS 18.23.030(b). Alaska Statute 18.23.010(a) limits when an informant to a review organization can be held liable for defamation and similar actions: "A person providing information to a review organization is not subject to action for damages or other relief by reason of having furnished that information *unless the information is false* and *the person providing the information knew or had reason to know* the information was false."[57] This language tracks the language of the false information exception.

Another provision, AS 18.23.020, limits liability for members of a review organization. It provides that members are shielded from liability arising from the action or recommendation of a review organization as long as they acted based on "the reasonable belief that the action or recommendation is warranted by facts known to the person or to the review organization" and took "reasonable efforts to ascertain the facts upon which the review organization's action or recommendation is made."[58] Reading these provisions of the peer review statute together suggests that the false information exception was intended to permit discovery in cases where submission of false information is a required element.

Second, the legislative history of the peer review statute also supports this limitation on the scope of the false information exception. The legislative history of the medical malpractice insurance bill as a whole repeatedly emphasizes the legislature's

---

[55] (...continued) 1994)).

[56] *See* Ch. 102, § 40, SLA 1976.

[57] AS 18.23.010(a) (emphases added).

[58] AS 18.23.020.

concern with the dual goals of (1) increasing the availability of affordable medical malpractice insurance and (2) protecting those who furnish information to review organizations from defamation suits. The most detailed piece of legislative history comes from a 1975 report and a supplemental report issued by a committee convened by the governor to study the malpractice insurance crisis in Alaska.[59] The report recommended reforms that ultimately led to the comprehensive medical malpractice insurance bill that included AS 18.23.

The report recognized that the dual goals were intertwined — to decrease the cost and increase the availability of malpractice insurance, there needed to be a culture of self-policing in the medical profession.[60] However, fears of defamation suits impeded establishing such a culture: "[M]edical practitioners [were] reluctant to divulge information concerning observed negligence or misconduct for fear the practitioner involved w[ould] bring an action for defamation," and, as a result, "more information [was] available from health care providers than [was] . . . made available to the licensing boards."[61] To address these fears, the committee recommended that individuals who provided information to a peer review committee should have immunity from defamation

---

[59] MALPRACTICE COMMISSION REPORT, *supra* note 5; *See* STATE OF ALASKA, REPORT OF THE GOVERNOR'S MEDICAL MALPRACTICE INSURANCE COMMISSION, SUPPLEMENT at cross-reference tbl., (1975), http://archives2.legis.state.ak.us/PublicImageServer.cgi?lib/7500370REPORT%20OF%20THE%20GOVERNOR%27S%20MEDICAL%20MALPRACTICE%20INSURANCE%20COMMISSION,%20SUPPLEMENT.pdf.

[60] MALPRACTICE COMMISSION REPORT, *supra* note 5, at 48.

[61] *Id.* at 50.

actions.[62]  This was the committee's only recommendation specific to what ultimately became AS 18.23.

Other relevant pieces of legislative history also emphasize limiting defamation liability for those who participate in and provide information to review organizations.  At the same time, these materials fail to mention any exception to the peer review privilege.  A sectional analysis of the medical malpractice insurance bill performed by one of the bill's sponsors includes a brief description of the portion of the bill that ultimately became AS 18.23.  The description simply states that the peer review statute "[l]imits liability for persons providing information to a review organization and for members of a review organization" and "[p]rovides that records of a review organization are immune from discovery in a suit."[63]  Similarly, a comparison of the House and Senate versions of the medical malpractice insurance bill prepared by the Legislative Affairs Agency mentions the portion that became AS 18.23 only in the context of limiting defamation liability.[64]

The legislative history's emphasis on limiting defamation liability and decreasing the cost of malpractice insurance — coupled with its silence with regard to any exception to the peer review privilege — counsels in favor of construing any exception to the privilege narrowly.  Although the legislative history of the medical malpractice insurance bill admittedly contains little information specific to the peer review privilege or its exceptions, we conclude that the broad aims of the bill that we

---

[62]      *Id.*

[63]      Representative Ted Smith, Summary of Medical Malpractice Insurance Bill CSHB 574, 9th Leg., 2d Sess. at 2, Alaska Leg. (May 20, 1976).

[64]      Legislative Affairs Agency, Medical Malpractice Bills in Free Conference Committee, 9th Leg., 2d Sess. at 2, Alaska Leg. (undated).

have just distilled should guide our interpretation of this exception. If the legislature had intended to establish a widely available exception to the privilege — i.e., one available to any plaintiff alleging the provision of false information to a review organization, as the Estate and Brandt urge — it is likely that the legislative history would include at least some discussion of this exception. But no such mention appears. Instead, the drafters of the medical malpractice bill focused on shielding participants in the peer review process from liability in order to foster a culture of self-policing and increase the affordability and availability of malpractice insurance. Allowing any plaintiff alleging the provision of false information to obtain otherwise privileged information under this exception would undermine these goals by facilitating malpractice suits and deterring candor in peer review proceedings. The legislative history and other provisions of AS 18.23 indicate that the false information exception is available only to plaintiffs bringing the actions for which provision of false information is an element of the claim.

We therefore reverse the April 2015 discovery order in *Bolinder* and the August 2016 order in *Brandt*. Both orders permit discovery of materials related to Mat-Su's decision to grant, renew, suspend, or terminate Dr. Zwiacher's medical staff membership. The false information exception does not apply in either of these cases and thus does not allow discovery from Mat-Su's peer review committees of materials related to the decision to grant, renew, suspend, or terminate Dr. Zwiacher's credentials at Mat-Su. But we again note that the Estate and Brandt may seek discovery of such information and materials from alternative sources outside the peer review process.

V.    **CONCLUSION**

We REVERSE the April 27, 2015 discovery order in *Bolinder* and the August 24, 2016 order in *Brandt*. We AFFIRM in part and REVERSE in part the June 10, 2015 discovery order in *Bolinder* as detailed above. We REMAND for further proceedings consistent with this opinion.