*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KENNETH M. DUFFUS, | ) |
| | ) Supreme Court Nos. S-17873/17893 |
| Appellant and | ) |
| Cross-Appellee, | ) Superior Court No. 3AN-13-05596 CI |
| | ) |
| v. | ) O P I N I O N |
| | ) |
| LEE E. BAKER JR., | ) No. 7602 – July 15, 2022 |
| | ) |
| Appellee and | ) |
| Cross-Appellant. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Adam Cook, Birch Horton Bittner & Cherot, Anchorage, for Appellant/Cross-Appellee. Michael Bedinger, Jones Bedinger, LLC, Anchorage, for Appellee/Cross-Appellant.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices. [Henderson, Justice, not participating.]

WINFREE, Chief Justice.

## I.      INTRODUCTION

A limited liability company (LLC) member sold his LLC interest to another LLC member as part of a settlement agreement, under which funds were to be paid to the selling member and his attorneys. A judgment creditor of the selling member sought a charging order against the settlement funds; meanwhile, the selling member's attorneys

filed an attorney's lien against the same funds. The superior court granted the charging order and enforced the attorney's lien, resulting in partial recoveries for the judgment creditor and the attorneys. The judgment creditor appeals, arguing that the attorney's lien was invalid, or, if valid, should have been prioritized beneath his charging order. The selling member cross-appeals, arguing that the charging order was invalid and, if valid, should have been prioritized beneath the attorney's lien. Because evidentiary issues prevent us from determining the validity or extent of the charging order and lien, we remand for the superior court to conduct the appropriate evidentiary inquiries.

## II.   LEGAL BACKGROUND OF LIMITED LIABILITY COMPANIES

The LLC is a relatively new form of business organization combining limited liability features of corporations with tax treatment of general partnerships.[1] LLC members enjoy a measure of immunity from personal liability for the LLC's actions and liabilities while also benefitting from pass-through taxation, meaning that the LLC's income generally is not taxed separately before "passing through" to its members.[2] Alaskans have been able to use this hybrid form of business organization since 1995.[3]

---

[1]   Joseph P. Briggett, *The Rights of a Judgment Creditor Against an LLC, Under Various States' Charging Order Statutes*, 39 REV. BANKING & FIN. L. 277, 284, 292-93 (2019); John Dwight Ingram, *Limited Liability Companies*, 6 FLA. STATE UNIV. BUS. L. REV. 1, 6-7 (2007); Katherine Quigley, *Converting to a Limited Liability Company: Considerations for Alaska Business Organizations*, 13 ALASKA L. REV. 289, 297-98 (1996).

[2]   Briggett, *supra* note 1, at 287-89; Ingram, *supra* note 1, at 2.

[3]   Ch. 99, §1, SLA 1994 (enacting Alaska LLC law); *see* Alaska Revised Limited Liability Company Act, AS 10.50.010-.995; Minutes, House Judiciary Comm., Hearing on H.B. 420, 18th Leg., 2d Sess. No. 353 (March 23, 1994) (testimony of Rep. Gene Therriault, House District 33, bill sponsor) (describing LLC as "new hybrid form of business structure . . . that combines the tax advantages of a partnership and the

(continued...)

Just as LLC members enjoy limited liability for LLC actions and liabilities, LLCs enjoy protection from members' non-business activities.[4] Because a person can become an LLC member only "in compliance with the operating agreement of the company" or with the consent of all LLC members,[5] many jurisdictions, including Alaska, allow a judgment creditor to reach a member's LLC interest exclusively through an instrument called a charging order.[6] The judgment creditor may not acquire the LLC member's interest; the charging order requires "only that the LLC pay to the creditor any distributions that otherwise would be due to the member."[7] Distributions are payments LLCs make to their members, either during the life of the LLC (interim distributions)[8]

---

[3] (...continued) liability safeguards of a corporation").

[4] Briggett, *supra* note 1, at 287-91 (discussing reverse veil piercing).

[5] AS 10.50.155(a) (outlining LLC membership requirements).

[6] Briggett, *supra* note 1, at 297; AS 10.50.380 ("This section provides the exclusive remedy that a judgment creditor of a member or a member's assignee may use to satisfy a judgment out of the judgment debtor's interest in the limited liability company."). The legislature has clarified that a charging order is a creditor's exclusive remedy in law or equity. AS 10.50.380(c); ch. 45, §4, SLA 2013 (enacting amendments to AS 10.50.380(c) to address equitable remedies). Commentary on AS 10.50.380(c) and similar exclusive remedy provisions suggests that "legislatures perceive the charging order as so broad and potentially useful a tool that no other remedy is needed and that, in fact, it needs explicit limitation." Chad J. Pomeroy, *Think Twice: Charging Orders and Creditor Property Rights*, 102 KY. L.J. 705, 721 n.102, 722 (2014).

[7] Briggett, *supra* note 1, at 297; *see* AS 10.50.380(b) (stating that holder of charging order has same rights as would assignee of LLC member's interest); AS 10.50.375(b) (stating that assignee of member's interest has right only to LLC distributions due to member).

[8] AS 10.50.990(8) (defining "interim distribution" as "a distribution of the (continued...)

or at the dissolution and winding up stage (final distributions).[9]

An LLC typically is governed by an operating agreement.[10] In Alaska, state law fills gaps if operating agreements are silent. For example, if an LLC's operating agreement does not specify how distributions are to be allocated to members, Alaska law requires equal distributions to all members by default.[11] But Alaska law also affords LLC members the flexibility to choose different distribution arrangements.[12]

## III.    FACTS AND PROCEEDINGS

### A.    General Background

Lee Baker and Kenneth Duffus formed Harvest Properties, LLC to develop a parcel of land near Anchorage. They also were jointly involved in a project involving

---

[8]    (...continued) assets of a limited liability company to the company's members," excluding final distributions); AS 10.50.295 (governing interim distributions under LLC operating agreement); AS 10.50.300 (governing interim distributions without LLC operating agreement); *cf.* AS 10.06.990(17) (defining "distribution to its shareholders" in Alaska Corporations Code as "the transfer of cash or property by a corporation or its subsidiary to its shareholders without consideration, whether by way of dividend or otherwise, except a dividend in shares of the corporation, or the purchase or redemption of its shares for cash or property").

[9]    AS 10.50.425 (governing distribution of assets during dissolution and winding up process and noting that distribution procedure may be modified by LLC's operating agreement).

[10]    *See* Ingram, *supra* note 1, at 3; AS 10.50.070-.095 (detailing LLC organization and allowing members to establish operating agreements).

[11]    AS 10.50.300.

[12]    AS 10.50.295 (allowing LLCs to create operating agreements "authoriz[ing] different interim distributions for different classes of members"); AS 10.50.425 (allowing LLCs to modify in their operating agreements statutory procedure for distribution of assets following dissolution).

a parcel called Marion Bowen.  Both projects failed, each leading to over a decade of litigation involving claims by creditors and between Baker and Duffus.

As explained below, in two separate lawsuits Duffus obtained judgments against Baker that remain largely unsatisfied.  Baker's sole significant asset was a 50% membership interest in Aurora Park, LLC, and its sole relevant asset was the Aurora Park apartment complex (the Apartments) in Anchorage.  Baker ultimately transferred his interest in Aurora Park in a settlement agreement between Baker and the other LLC member.

To understand the parties' arguments on appeal, it is first necessary to understand the Marion Bowen litigation, the Harvest Properties litigation, and the Aurora Park settlement agreement.  We then set out the specific Marion Bowen proceedings underlying this appeal.

**B.    Marion Bowen Litigation**

Disputes over the failed Marion Bowen project resulted in a 2008 confession of judgment,[13] with Baker agreeing to pay Duffus $150,000 plus interest. Baker gave Duffus a "partial assignment of proceeds" from "any sale, conveyance, transfer or disposition" of the Apartments that Baker should be entitled to under his 50% interest in Aurora Park.  Duffus recorded this assignment.  Baker and Duffus agreed that Duffus could enforce the confession of judgment against Baker if the Apartments did not sell within five years.

The Apartments were not sold, and in 2013 Duffus sought to enforce Baker's confession of judgment.  Judgment in the amount of $252,585.06 was entered in Duffus's favor.  Duffus apparently took no further relevant action until 2019, later explaining that, despite obtaining the favorable judgment:  "[T]here was nothing to

---

[13]    *See generally* Alaska R. Civ. P. 57 (governing confession judgment).

execute on. [He] could only hope that Aurora Park would eventually sell [the Apartments], triggering a company distribution to . . . Duffus as assignee."

### C.     Harvest Properties Litigation

Baker and Duffus were personally liable for a large bank loan to their LLC that financed the Harvest Properties venture.[14] In 2007, after the venture failed, the bank sued to recoup its money.[15] Duffus and Baker each settled with the bank, but litigation between the two proceeded to a jury trial in 2016.[16] Duffus obtained a roughly $1.2 million judgment against Baker,[17] and Baker appealed.[18] While the case was on appeal, in May 2017 the Harvest Properties court granted Duffus a charging order against LLC distributions flowing from Baker's 50% membership in Aurora Park.

### D.     Aurora Park Lawsuit And Further Harvest Properties Action

Taking the Harvest Properties and Marion Bowen judgments together, by 2017 Baker owed Duffus roughly $1.5 million, excluding interest. Duffus's path to recovery soon got more complicated.

Northern Trust Real Estate, Inc. is a corporation; its purpose is managing Aurora Park and it is owned 100% by Patricia Baker, Baker's ex-wife and the other 50% member of Aurora Park.[19] Northern Trust and Aurora Park sued Baker in August 2016, alleging that Baker had violated his fiduciary duties to Aurora Park and failed to make

---

[14]     *Baker v. Duffus*, 441 P.3d 432, 434 (Alaska 2019).

[15]     *Id.*

[16]     *Id.* at 434-35.

[17]     *Id.* at 435.

[18]     *Id.*

[19]     To avoid confusion, we hereafter refer to Patricia by her first name. We intend no disrespect.

capital contributions. Patricia joined as an individual plaintiff in early 2018.

Part of the dispute concerned the effect of Duffus's 2017 Harvest Properties charging order on Baker's interest in Aurora Park. The charging order potentially triggered a clause in Aurora Park's operating agreement that would allow Aurora Park to acquire Duffus's interest in the charging order. Duffus, Patricia, and Aurora Park agreed that Aurora Park would sell the Apartments and distribute Baker's share of the proceeds (50%) to Duffus. But Baker argued that the Aurora Park operating agreement did not authorize such a sale; the sale never happened. Instead, in September 2018 the parties settled, without including Duffus, and the case was dismissed with prejudice.

The settlement agreement set out four contingencies depending on whether Patricia and Aurora Park could sell or refinance the Apartments. The parties ended up within the contingency applicable if Patricia were "unable to refinance the [Apartments] by April 1, 2019." Under this contingency, Baker agreed to quitclaim his interest in Aurora Park to Patricia in exchange for a $50,000 payment. Patricia and Northern Trust additionally agreed to pay $250,000 to Jones Law Group (JLG), the firm representing Baker in the Aurora Park lawsuit and other litigation. The settlement was structured with initial $50,000 payments to Baker and to JLG, with subsequent $3,000 monthly payments to JLG until the remaining $200,000 was paid in full. Patricia and Northern Trust also agreed to execute a $200,000 confession of judgment in JLG's favor in case of missed payments. The two initial $50,000 payments were, by agreement, deposited with the court registry.

After the Aurora Park settlement, Duffus attempted to intervene in that lawsuit; he argued that the Harvest Properties charging order applied to the settlement funds because Aurora Park had violated its agreement to sell the Apartments and give him 50% of the proceeds. In January 2019 the Aurora Park court told Duffus to seek relief from the Harvest Properties court that had issued the charging order. Duffus then

returned to the Harvest Properties court; in April that court held that the charging order applied to the entirety of the settlement funds.[20]  The Harvest Properties court ordered the settlement funds paid to the court registry for distribution to Duffus.

In May we reversed the Harvest Properties judgment underlying the charging order and remanded for a new trial.[21]  Duffus then returned to the Marion Bowen litigation, where Baker's unpaid $150,000 confession of judgment from 2008, with interest, had ballooned to an outstanding debt of roughly $460,000.  Duffus asked the Marion Bowen court to issue its own charging order against the Aurora Park settlement funds.[22]

### E.    Proceedings Underlying This Appeal

The Marion Bowen court held an October hearing on Duffus's request for a charging order and granted the order in December.  The court directed the entirety of

---

[20]    The Harvest Properties court reasoned that its charging order "include[d] language intended to ensure that it applie[d] to a broad set of payments that might be made on behalf of [Baker]" and pointed out that the charging order characterized "[d]irect or indirect payments" to Baker as "distributions."  The Harvest Properties court concluded that the $50,000 paid to Baker was a direct payment while the $250,000 payable to JLG was an indirect payment because it would "benefit[] [Baker] by eliminating or reducing his debt to his lawyers."  The Harvest Properties court also concluded that the payments were Aurora Park distributions, despite coming from Patricia and Northern Trust, because "[t]he sale proceeds of the transaction that eliminated [Baker's] interest in Aurora [Park] were an asset of Aurora [Park] that are to be transferred to [Baker]."

[21]    *Baker*, 441 P.3d at 438.

[22]    After we reversed the Harvest Properties judgment, the Harvest Properties court ordered the settlement funds to remain in the court registry until their status could be determined by the Marion Bowen court.  Baker disputes the propriety of this action, but the Harvest Properties court's order is not before us in this appeal, which comes only from the Marion Bowen litigation.

Baker's Aurora Park settlement funds be distributed to Duffus. The court's reasoning echoed that of the Harvest Properties court; the settlement funds Patricia and Northern Trust paid Baker were Aurora Park "[buying out] . . . Baker's interest and, thus, the payments constitute[d] distributions." The court also reasoned that the payments to JLG were covered by the charging order as "indirect" payments to Baker because they reduced his debt to his attorneys.

The Marion Bowen court appears to have concluded that, for purposes of the charging order, payments made by Patricia and Northern Trust counted as distributions from Aurora Park. For example, the Marion Bowen court cited an order from the Harvest Properties court to support the position that "Aurora Park paid the first $100,000 [of the settlement funds] to the court registry." But the Harvest Properties court order states that Patricia paid these funds. The Marion Bowen court also wrote that Aurora Park "or its other princip[al], . . . Patricia[,] . . . agreed to pay [the settlement funds]." As we explain later, the distinctions matter.

After granting Duffus's charging order, the Marion Bowen court learned that another lien had been filed against Baker's settlement funds. During the October hearing the court had asked whether there was an attorney's lien in the Aurora Park lawsuit and had been correctly told there was not. But in November JLG filed an attorney's lien in the Aurora Park lawsuit. Upon learning about the lien, the Marion Bowen court invited the parties to submit additional briefing regarding which instrument should take priority. The Marion Bowen court later concluded that it had authority to enforce the attorney's lien even though the lien was filed in the Aurora Park lawsuit. The Marion Bowen court ultimately determined that the funds already in the court registry before the attorney's lien was filed (roughly $122,000) could not be subject to the attorney's lien but that the attorney's lien took priority for the funds not yet paid (roughly $128,000).

The Marion Bowen court decided the charging order and attorney's lien issues on the parties' briefing; it did not conduct an evidentiary hearing about the source of the Aurora Park settlement funds or the value of the legal services JLG provided Baker in the Aurora Park lawsuit, although Baker and Duffus disputed key underlying facts.

Duffus appeals, arguing the attorney's lien is invalid, but, if valid, should not take priority over his charging order. Baker cross-appeals, arguing the charging order is invalid, but, if valid, should not take priority over the attorney's lien.

## IV. STANDARD OF REVIEW

Charging orders and attorney's liens are governed by statute.[23] We consider questions of statutory interpretation using our independent judgment.[24] Whether the settlement funds count as LLC distributions under Alaska law is a mixed question of law and fact:[25] The applicability of a statutory definition is a question of law which we review de novo and the underlying findings of fact are reviewed for clear error.[26] But if factual determinations are based on insufficient evidence, appellate review is not

---

[23] AS 10.50.380 (laying out Alaska's charging order rules); AS 34.35.430 (delineating attorney's lien rules).

[24] *Mat-Su Valley Med. Ctr., LLC v. Bolinder*, 427 P.3d 754, 762-63 (Alaska 2018); *Anderson v. Alyeska Pipeline Serv. Co.*, 234 P.3d 1282, 1286 (Alaska 2010).

[25] *Cf. Bilbao v. Bilbao*, 205 P.3d 311, 313 (Alaska 2009) ("A trial court's characterization of property as separate or marital may involve disputed facts and questions of law. We review findings of fact under the clearly erroneous standard, and we review questions of law de novo using our independent judgment.").

[26] *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005) ("We review a trial court's rulings on questions of fact for clear error. We review a trial court's rulings on questions of law, and the application of law to fact, de novo . . . ." (footnote omitted)).

appropriate until the proper evidentiary inquiries have been made.[27] Lien priority is a question of law that we consider de novo, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[28]

## V. DISCUSSION

Duffus presents two issues for review: (1) whether JLG's attorney's lien is valid and (2) whether it should have been given priority over Duffus's claim for money still held by Aurora Park when the attorney's lien was filed. Baker presents two additional questions in his cross-appeal: (1) whether the Marion Bowen charging order is valid and (2) whether the charging order could properly reach the portion of the settlement payable to JLG. As we explain below, further evidence is necessary to determine the validity of the charging order. And, although the lien is valid, further evidence is necessary to determine its amount. We therefore remand to the superior court for an evidentiary hearing on both issues.

### A. The Marion Bowen Court's Charging Order

Charging orders give "judgment creditor[s] . . . only the rights of an assignee of the member's interest."[29] Assignees, in turn, may receive, "to the extent assigned, only the distributions to which the assignor is entitled."[30] As a judgment creditor awarded a charging order against Aurora Park, Duffus may receive "only

---

[27] *Cf. Horne v. Touhakis*, 356 P.3d 280, 283-84 (Alaska 2015) (remanding child support case because superior court's imputed income findings for obligor were not sufficiently based on evidence and discussing other similar cases).

[28] *Falconer v. Adams*, 20 P.3d 583, 584 (Alaska 2001).

[29] AS 10.50.380(b) (explaining rights of judgment creditor to judgment debtor's LLC assets).

[30] AS 10.50.375(b) (explaining rights of assignees to LLC member's interest).

distributions to which [Baker] is entitled."[31] The validity of Duffus's Marion Bowen charging order on Baker's settlement funds therefore turns on whether the settlement funds paid by Patricia and Northern Trust were a "distribution" by Aurora Park.

### 1. The settlement proceeds as distributions

The Marion Bowen court concluded that the Aurora Park settlement payments "constitute[d] distributions." The court concluded that, in addition to the direct payments to Baker, the JLG payments were "indirect payment[s]" to Baker because they "eliminated or reduc[ed] [his] debt to his lawyers." For reasons not fully explained, the court relied on the Alaska Corporations Code's definition of "distribution to [a corporation's] shareholders," which is "the transfer of cash or property by a corporation . . . to its shareholders . . . or the purchase or redemption of its shares for cash or property."[32] A share redemption is a transaction in which a corporation purchases shares of its stock from shareholders.[33] The court analogized the settlement, which involved Baker transferring his membership interest in Aurora Park to Patricia, to a corporation's share redemption and therefore a distribution under the Corporations Code. The court explained that its reasoning was appropriate because "Baker was originally supposed to satisfy the judgment in this case . . . by selling his shares in Aurora Park." But the court's statement was incorrect: Under the original assignment of proceeds Baker gave

---

[31] *See id.*

[32] AS 10.06.990(17). We note that unlike a corporation, which issues shares of stock to its owners, an LLC has "members" with membership interests. *Compare* AS 10.06.990(40)-(41) (defining shares as units of "proprietary interest[] in a corporation"), *with* AS 10.50.155 (stating that one requirement of LLC membership is an "interest" in LLC).

[33] *See generally* AS 10.06.385, .388 (describing corporation's redemption authority and ability to reissue redeemed or otherwise purchased shares).

Duffus, Duffus was to receive any Aurora Park distribution to Baker when Aurora Park sold the Apartments, and under the later agreement among Patricia, Aurora Park, and Duffus (but not Baker), Aurora Park was to sell the Apartments and distribute Baker's share of the proceeds to Duffus.

Baker makes two primary arguments why the Marion Bowen court's reasoning is erroneous. Baker first contends that the court erroneously relied on the definition of "distribution" from the Corporations Code instead of looking first to Alaska LLC law or the Aurora Park operating agreement. Baker argues that Alaska LLC law "does not include a definition of 'distribution' in its definitions section or in its Article dedicated to distributions," instead referring to "the LLC's operating agreement," and that the Aurora Park operating agreement defines distributions as payments of excess cash. Baker secondly points out that the settlement money was paid by "Patricia (individually) and [Northern Trust]," not Aurora Park, and could not have been an LLC distribution.

We agree with Baker that the Corporations Code definition of "distribution" is inapplicable to LLCs; because Alaska LLC law addresses both charging orders[34] and distributions,[35] we look there first. But contrary to Baker's assertion that Alaska LLC law does not "include a definition of 'distribution,' " Alaska LLC law recognizes two types: interim distributions and final distributions.[36] Interim distributions are "a

---

[34]    AS 10.50.380 (addressing judgment creditors' rights).

[35]    AS 10.50.295-.340 (governing interim distributions); AS 10.50.425 (governing final distributions).

[36]    *See supra* note 35.

distribution of the assets of a limited liability company to the company's members";[37] final distributions occur as part of the dissolution and winding up process.[38] The settlement funds, if a distribution at all, were interim distributions.

Interim distributions necessarily involve "a distribution of the assets of a limited liability company."[39] The Marion Bowen court apparently determined that Patricia's and Northern Trust's payments constructively were made by Aurora Park, even though the funds came directly from Patricia and Northern Trust. It may be that the funds Patricia and Northern Trust paid originated from Aurora Park, possibly qualifying them as distributions.[40] But absent evidence tracing the funds to Aurora Park, they were not LLC distributions. Because the Marion Bowen court did not inquire into the funds' origins and merely imputed them to Aurora Park, apparently as a matter of law without regard to the funds' actual source, we cannot review the legal conclusion that the funds were LLC distributions.[41]

---

[37]     AS 10.50.990(8).

[38]     AS 10.50.425.

[39]     AS 10.50.990(8).

[40]     Alaska LLC law defines interim distributions as transfers of company assets "to the company's members." AS 10.50.990(8). Baker contends that the charging order's timing, issued after he already had transferred his membership in Aurora Park to Patricia, made it invalid. Baker transferred his Aurora Park interest in the spring of 2019, but the charging order was not issued until December. If the settlement funds indeed were distributions — as defined under LLC law — when the settlement was reached and Baker still was an LLC member, the charging order may apply. Structuring the settlement as monthly installments occurring in part after Baker transferred his Aurora Park interest rather than as a lump sum does not meaningfully impact the analysis.

[41]     *Cf. Horne v. Touhakis*, 356 P.3d 280, 283-84 (Alaska 2015) (remanding
(continued...)

We note also that Aurora Park's operating agreement defines "interim distribution" differently from Alaska LLC law. The operating agreement allows interim distributions when "cash on hand exceeds the . . . needs for operating expenses, debt service, reserves, and additional capital expenses." If the operating agreement's definition controls, an evidentiary hearing would be needed not only to trace settlement funds to Aurora Park but also to demonstrate that the funds originated from excess cash. But whether the operating agreement's definition controls is unclear at this juncture. Alaska laws give an LLC flexibility to deviate from the default requirement of paying each member an equal share of distributions, but the laws may not necessarily give an LLC the flexibility to change the definition of a distribution.[42]

Baker also argues that the charging order, even if valid, does not apply to the portion of the settlement funds payable to JLG. Because a charging order applies only to LLC distributions, we conclude that the charging order cannot apply to any part of the settlement funds unless they are a distribution traceable to Aurora Park assets. If the funds payable to JLG are traceable to Aurora Park, they might be subject to the charging order pending resolution of the timing and definition issues described above and the evidentiary issues related to the attorney's lien discussed below.

For the foregoing reasons, we remand to the superior court for an evidentiary hearing to determine whether the settlement funds are a distribution

---

[41]    (...continued)
child support decision because superior court's imputed income findings for obligor were not sufficiently based on evidence and discussing similar cases).

[42]    *See* AS 10.50.295 (stating "[t]he operating agreement of the company may authorize different interim distributions for different classes of members," but indicating company may alter only "manner" in which interim distributions are paid, not "interim distribution" definition); AS 10.50.990(8) (defining "interim distribution" without taking into account presence of operating agreement).

originating from Aurora Park.

### B. The Aurora Park Lawsuit Attorney's Lien

Alaska Statute 34.35.430(a)(1)-(4) delineates four types of attorney's liens. JLG asserted a charging lien under AS 34.35.430(a)(3), giving an attorney a lien "upon money in the possession of the adverse party in an action or proceeding in which the attorney is employed, from the giving of notice of the lien to that party." The Marion Bowen court ruled that JLG held a valid $250,000 attorney's lien in the Aurora Park lawsuit but that the lien was applicable only to settlement funds which had not been paid into the court registry by the date of the attorney's lien — a sum of $127,840.50. The Marion Bowen court held that the attorney's lien took priority over Duffus's charging order and observed that this would result in partial recovery for Duffus and partial payment for JLG. Duffus challenges the attorney's lien on several fronts.

Duffus argues that by accepting a confession of judgment from Patricia and Northern Trust in the Aurora Park lawsuit settlement agreement, JLG waived its right to assert an attorney's lien. Duffus explains that two conditions must be met under AS 34.35.430(a)(3) to establish a valid attorney's lien: "(1) compensation due from a client to an attorney, and (2) money in the possession of an adverse party in an action or proceeding in which the attorney is employed." Duffus claims Baker "asserted, but never demonstrated" that JLG was "due compensation" in the Aurora Park lawsuit, and "[t]here [was] no evidence in the trial record" of either an express or implied fee agreement. Duffus calls the settlement agreement "highly problematic" evidence of an agreement, given that the funds otherwise would go to Duffus, not to JLG's client, Baker.[43]

---

[43] Duffus does not contest the second prong of his statutorily derived test: whether the "money [is] in the possession of an adverse party in an action or proceeding

(continued...)

-16- 7602

Quoting *Law Offices of Steven D. Smith, P.C. v. Ceccarelli*, Duffus also argues that, even if the lien were valid, "enforcement of a valid attorney's lien is accomplished 'based on equitable considerations.' "[44] Duffus points to Baker's 2008 Marion Bowen assignment to Duffus of "any proceeds" from "any sale, conveyance, transfer or disposition of the [Apartments] on the basis of [Baker's] 50% member interest in Aurora Park." Duffus argues that Baker's transfer of his interest in Aurora Park to Patricia as part of the Aurora Park settlement agreement triggers this assignment and that Duffus's claim to the settlement funds therefore should be equitably prioritized over the attorney's lien.[45] For reasons explained below, we decline to address the priority of the various claims to the settlement funds and analyze only the validity of the attorney's lien.

---

[43]     (...continued)
in which [JLG] is employed." We note that the settlement funds yet to be paid into the court registry meet this definition, as they currently are held by some combination of Aurora Park, Patricia, and Northern Trust, who were adverse parties in the Aurora Park lawsuit that produced the settlement. The parties agree with the Marion Bowen court that validity of an attorney's lien from that litigation can be resolved in the Marion Bowen case.

[44]     385 P.3d 841, 844 (Alaska 2016) (quoting *In re Sea Catch, Inc.*, 36 B.R. 226, 230 (Bankr. D. Alaska 1983)).

[45]     The 2008 assignment of proceeds appears similar to a charging order, but the 2008 assignment also appears to be limited to a distribution by Aurora Park to its members from a sale of the Apartments, which has yet to occur. Duffus's assertion that Baker's sale of his Aurora Park LLC membership to Patricia triggers the 2008 assignment of proceeds is yet a step beyond the Marion Bowen court's assertion that Patricia's personal payments for her purchase of Baker's LLC membership was an LLC distribution. Whether Patricia took Baker's LLC interest subject to Baker's earlier assignment of proceeds to Duffus is not at issue in this case.

## 1. Waiver of the attorney's lien issue

Baker argues that Duffus did not contest the validity of the attorney's lien in his supplemental briefing before the Marion Bowen court and therefore waived the issue. We disagree. Duffus advanced several arguments against the enforceability of the lien, including that: (1) JLG surrendered its claim for fees against Baker by agreeing to the settlement in which it would be paid directly by Patricia and Northern Trust; (2) an attorney's lien could not apply because the settlement actually was a buyout of Baker's interest in Aurora Park and not a fund generated by JLG's efforts; and (3) the amount due JLG under the settlement included compensation for "matters outside of the subject litigation" for which the firm was not entitled to an attorney's lien.

Duffus did not further litigate the validity of the attorney's lien in the Marion Bowen court because subsequent proceedings were about the priority of the attorney's lien against Duffus's charging order and the Marion Bowen court's jurisdiction; the lien's validity was not an issue after the Marion Bowen court ruled that it was valid. Duffus thus did not waive the attorney's lien issue.

## 2. Permissibility of the attorney's lien

According to Duffus, JLG's participation in the Aurora Park lawsuit settlement negated its ability to assert an attorney's lien in two ways. Duffus first points to a clause whereby each party agreed to bear its own costs and fees as evidence that JLG was surrendering any claim for attorney's fees. Duffus characterizes JLG as a "party" to the settlement agreement and argues that JLG agreed to bear its own costs and fees and "released its claims against . . . Baker in exchange for a new promise by Aurora Park." Duffus next points out that JLG secured an agreement that Patricia and Northern Trust would confess judgment and argues that this negated JLG's right to assert an attorney's lien against the settlement funds. The Marion Bowen court did not find these arguments persuasive; nor do we.

The settlement agreement clause making each party responsible for paying its own fees is, as Baker points out, standard language intended simply to prevent parties from upsetting a settlement by later seeking attorney's fees through additional litigation. And Baker's agreement to be responsible for his own attorney's fees (to JLG) does not on its own obviate JLG's right to an attorney's lien on Baker's settlement funds. Duffus's argument that JLG was a "party" to the settlement also is not persuasive. As the Marion Bowen court noted, JLG represented Baker throughout the Aurora Park lawsuit; it was not advocating on its own behalf as a litigant. It is true that JLG participated in the settlement negotiations, but it appears to have done so to secure attorney's fees through the settlement funds. Although this may be unusual, this activity on its own does not transform JLG into a "party" to the underlying litigation.

Nor does JLG's arrangement to receive fees under the settlement agreement preclude its ability to pursue an attorney's lien against the settlement funds. As the Marion Bowen court observed, we have recognized that the attorney's lien statute is liberally construed to allow attorneys to recover compensation for their services.[46] We have held that a lien may be pursued even after receiving a confession of judgment because an attorney is "entitled to pursue any other collateral concurrent remedy before satisfaction of [the] judgment."[47] JLG's participation in the settlement agreement may have been unusual, but it did not preclude JLG from seeking to recoup fees through an

---

[46] AS 34.35.930 ("The intent of this chapter is remedial and its provisions shall be liberally construed."); *see Phillips v. Jones*, 355 P.2d 166, 172 (Alaska 1960) (recognizing that attorney's lien statute is to be liberally construed).

[47] *Sheehan v. Est. of Gamberg*, 677 P.2d 254, 258 (Alaska 1984). Duffus correctly notes that in *Sheehan* the confession of judgment came from the attorney's own client, not an adverse party. *Id.* But this distinction does not change the analysis; the confession of judgment comes from the possessor of the funds, and the claim for attorney's fees properly lies against the client. *See id.*

attorney's lien. JLG's efforts "created the property against which the lien is being asserted,"[48] the Marion Bowen court found "the payments were intended to reduce . . . Baker's debt to JLG," and we see no clear error in that finding.[49] JLG permissibly could assert an attorney's lien against the settlement funds.

### 3. Evidentiary issues concerning attorney's lien

Although we conclude that JLG's attorney's lien is valid, Duffus casts doubt on the actual value of JLG's services rendered in the Aurora Park lawsuit. As Duffus notes, evidence of the value of JLG's legal services is scant, at best. Baker argues that the Marion Bowen court's conclusion that the parties in the Aurora Park lawsuit intended the portion of the funds designated for JLG to be compensation for

---

[48]     *Id.* at 257 (emphasizing attorney's right to assert lien against property attorney helped create); *see also Sea Catch*, 36 B.R. at 234 (endorsing equity of giving attorney right to assert lien over fund designed in part to be "compensation for the attorney's services").

[49]     The Marion Bowen court noted the general rule that an "attorney cannot assert an attorney's lien in one case to recover fees and costs resulting from a different case." After supplemental briefing, the Marion Bowen court concluded — and the parties agreed — that JLG could have filed a separate action to enforce its lien. *See Ceccarelli*, 385 P.3d at 843-45 (finding attorney's lien filed in separate action against party that had been adverse to attorney's client in previous case valid and enforceable). The Marion Bowen court concluded that it had authority to enforce JLG's attorney's lien even though JLG sought to recover for fees incurred in the Aurora Park lawsuit. The Marion Bowen court said this would promote "judicial economy" and avoid forcing JLG to file a separate action for its attorney's lien, an action which could have ended up back before the very same court, and, given that Aurora Park was indifferent to the outcome of the attorney's lien dispute, would serve no purpose other than "elevating form over function."

Because the parties appear to agree that JLG may in this case seek to enforce an attorney's lien on the Aurora Park settlement funds for the value of its services in the Aurora Park lawsuit, we move forward under this arrangement without ruling on the matter.

JLG's services in that case is "amply supported by the record." The record support Baker points to includes: (1) the complaint in the Aurora Park lawsuit; (2) the Aurora Park settlement agreement; (3) the Harvest Properties charging order; and (4) Baker's assertions (through JLG) that the entire $250,000 was for fees in the Aurora Park lawsuit.

Baker's evidence comes up short. Even though the Marion Bowen court decided to enforce an attorney's lien filed in the Aurora Park lawsuit, not the Marion Bowen lawsuit, the lien itself can extend only to the services rendered in the Aurora Park lawsuit.[50] The Harvest Properties charging order Baker cites contradicts his claim and suggests that JLG's fees are for services rendered in multiple cases: "The $250,000 to be paid to [JLG] is presumably for attorney['s] fees [Baker] incurred in the present litigation, the [Aurora Park litigation], or in other matters." The other sources are little better, amounting to Baker's own assertions and proof that the Aurora Park lawsuit was filed and then settled.

In *Ceccarelli* we remanded an attorney's lien dispute when the parties disagreed about the fee amount and we found no evidence supporting the fee calculation.[51] Similarly, more evidence outside of Baker's assertions, such as fee agreements and billing records, is needed to establish the value of the legal services JLG provided in the Aurora Park lawsuit, especially because a portion of the settlement funds

---

[50]    *See Ceccarelli*, 385 P.3d at 844 (stating that attorney has "right to have fees and costs due to the attorney for services *in a particular suit* secured by the judgment or recovery *in such suit*" (emphases added) (quoting *Sea Catch*, 36 B.R. at 230)); WILLISTON ON CONTRACTS, *supra* note 48, § 62:11 ("A charging lien does not cover all amounts outstanding that may be due the attorney from the client for professional services rendered in other transactions. . . . [Such a] lien extends only to charges and fees in the suit in which the judgment was obtained."(footnote omitted)).

[51]    385 P.3d at 846.

JLG claims could be paid to Duffus if his charging order is valid. We therefore remand to the superior court to make the appropriate evidentiary inquiries.[52]

## VI.    CONCLUSION

The superior court's judgment enforcing the charging order is VACATED and the case is REMANDED for an evidentiary hearing. The superior court's order enforcing the attorney's lien also is VACATED and REMANDED for an evidentiary hearing to determine the amount of attorney's fees secured by the lien.

---

[52]    *See id*. Baker and Duffus also disagree whether the charging order should take priority over the attorney's lien. But generally we do not answer hypothetical questions. *Cf. State v. ACLU of Alaska*, 204 P.3d 364, 368-73 (Alaska 2009) (explaining principle that courts hesitate to answer hypothetical questions, especially when concrete facts prove useful). Because it has yet to be determined whether the charging order is valid and how much money may be included in the attorney's lien, we decline to decide which instrument would take priority, and how to weigh any attendant equitable considerations, without first remanding for the superior court to answer the prerequisite questions we have identified.